W. Stewart **ROBERTS**, Robert G. **Peters**, and Reuben D. **Peters**, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

Nos. 86 C 9934 to 86 C 9936.

United States District Court, N.D. Illinois, E.D.

April 6, 1990.

John Ryan, III and William Stevens, Rooks, Pitts and Poust, Chicago, Ill., for plaintiffs.

Frederick Branding, Asst. U.S. Atty., and Philip Karter, Trial Atty., Tax Div., Justice Dept., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

The above-captioned tax refund law suits were consolidated on June 10, 1988 before Judge Ilana Diamond Rovner. They involved the plaintiffs' respective federal personal income tax returns for the tax years 1984 and 1985.

On April 29, 1988, after discovery was completed, plaintiff W. Stewart Roberts filed a motion for summary judgment on various issues with supporting affidavits and a memorandum. Plaintiffs Robert G. Peters and Reuben D. Peters filed similar motions, supporting affidavits and memoranda.

At the same time, defendant United States of America filed a motion for summary judgement, together with its local Rule 12(e) statement of undisputed facts and a memorandum in support of its motion for summary judgment.

In addition to the foregoing documents, the Chicago Board Options Exchange, Inc., filed an amicus curiae memorandum in support of plaintiff W. Stewart Roberts' motion for summary judgment on or about May 23, 1989.

On May 26, 1988, Judge Rovner transferred the cases to the Executive Committee for a referral to a magistrate, and the cases were transferred to Magistrate James T. Balog for preparation of report and recommendation on the parties' motions for summary judgment.

On September 19, 1988, Magistrate Balog issued his report and recommendation. Essentially his report recommended that defendant's motion for summary judgment on all issues be denied and that plaintiffs' motions for summary judgment on all issues be granted. Thereupon the cases were returned to the calendar of the court.

On September 28, 1988, the plaintiffs filed an objection to the report and recommendation of Magistrate Balog.

Defendant, on October 25, 1988, filed an objection to the report and recommendation of Magistrate Balog, plaintiffs filed their response to the objections of defendant to the report and recommendation. Since the issues of law and fact have been extensively examined in the report, they will not be set forth in detail here.

At the time the complaints were filed in these matters, there had been no refunds paid for the years in question. Therefore the complaints requested payment of the

full amount of the refunds set forth in the amended federal income tax returns for the years in question. After the completion of the Internal Revenue Service's audits of the amended returns, which occurred during discovery, the IRS issued audit reports indicating that certain portions of requested refunds were not objected to by the IRS. Further, plaintiffs agreed to various adjustments in the audit reports. Therefore, the plaintiffs' summary judgment motions specified the items which were referred to as the "agreed issues", and requested immediate summary judgment as to the "non-objected to" amounts. On March 1, 1989, defendant indicated that partial remittances would be made as to certain portions of the requested refunds. The parties shortly thereafter filed a draft joint stipulation and consent order indicating that these concessions had been made in each of the cases and the parties agreed to entry of partial summary judgments which were entered by the court on April 24, 1989 against defendant as follows:

| | | |
|---|---|---|
| R.G. Peters | – | $1,091,372.00 |
| Reuben D. Peters | – | $1,185,058.00 |
| W. Stewart Roberts | – | $ 39,457.00 |

The refund balance sought by the plaintiffs, after payment of the aforesaid amounts, presently comprise the remaining amounts in controversy which are subject to the court's decision on the parties' cross-motions for summary judgment.

The amounts are:

| | | |
|---|---|---|
| R.G. Peters | – | $146,081.00 |
| Reuben D. Peters | – | $462,628.00 |
| W. Stewart Roberts | – | $236,193.00 |

The primary issue presented in all three refund suits is an issue of first impression, namely whether the taxpayers are allowed under Internal Revenue Code section 1212(c) to carry back their section 1256 contract losses incurred in 1986 in commodity futures and mixed straddles (i.e., Chicago Board Options Exchange options and the stocks underlying such options) to offset section 1256 contract gains in 1984 regardless of whether or not such losses were part of their mixed straddle account elections made pursuant to Temp.Treas. Reg. section 1.109(b)–4T.

In 1985, each of the taxpayers incurred significant section 1256 contract losses. In the cases of Reuben Peters and Stewart Roberts, a portion of the section 1256 contract losses were part of their mixed straddle account elections made pursuant to Temp.Treas.Reg. section 1.092(b)–4T, and a portion of the section 1256 contract losses were not part of such elections. In the case of Robert Peters, all section 1256 contract losses reported for 1985 were losses incurred independent of any mixed straddle account election.

In conjunction with the filing of their 1985 tax returns, the three taxpayers simultaneously filed amended 1984 tax returns which carried back the excess 1985 section 1256 contract losses against their 1984 section 1256 contract gains, and according to their calculations, entitled them to significant refunds of their 1984 taxes.

Upon the filing of the amended 1984 returns, the Internal Revenue Service conducted audits of each taxpayer and determined that they were entitled to carry back any portion of their total 1985 section 1256 contract losses which were not part of their mixed straddle account election on the theory that such losses are governed by section 1.1092(b)–4T rather than section 1256 and therefore, can be carried back under section 1212(c).

There are several other issues presented in these cases, all of which are the subject of one or more summary judgment motions, *to wit*:

1. Reuben D. Peters and Robert G. Peters—Free credit entry issue:

   Plaintiffs state that their CBOE market maker accounts were inadvertently credited by their clearing member with entries for interest. Defendant insists that these credits represent income in 1984, the year in which they were credited to plaintiffs' accounts. According to plaintiffs, no additional taxes are owed for 1984 because the credit entries were made in error and this error was discovered in 1985 and thereafter reversed.

2. Robert G. Peters—Jurisdictional challenge over section 1212(c) carryback issue:

Defendant argues that because the carryback of mixed straddle account losses has no effect on Peters' taxes for 1984 or 1985, the two years at issue in this refund suit, and he is only seeking a refund for 1984 based on other issues, the court lacks jurisdiction over this issue under 28 U.S.C. section 1346(a)(1) and 26 U.S.C. section 7422. Plaintiffs believe that since Robert G. Peters is requesting a refund for 1984, the treatment of mixed straddle carrybacks to 1984 is within the court's jurisdiction, as is the issue of a carryforward.

3. Robert G. Peters—Charitable donation:

Defendant contends that a charitable deduction claimed by Robert G. Peters in 1983 carried to 1984 was in fact a payment for a purchase at a charity auction rather than a donation. Peters contends that he did not purchase anything at the auction but only made a contribution. The issue is one of substantiation.

Finally, there were various other issues originally in controversy which have been settled by the parties during the course of this action.

As a housekeeping matter, plaintiffs object to the report and recommendation of the Magistrate on a matter relating to what appears to be a typographical error. Page 2 of the report contains the following statement: "Plaintiffs alleged that these carrybacks reduce their 1984 tax obligations *to* $275,650 for W. Stewart Roberts; $1,237,453 for Robert G. Peters; and $1,647,686 for Reuben D. Peters." (Emphasis added.) It is obvious that the statement is erroneous since plaintiffs alleged that the carrybacks reduced their 1984 tax obligations *by* the respective amounts. There being no response by the defendant, the plaintiffs' objection is sustained and the Magistrate's report and recommendation is amended accordingly.

Defendant, United States of America, objects to sections I, II, III and IV of the report and recommendation of the Magistrate in an eighteen-page statement of objections which the court has carefully considered as it has the response by the plaintiffs to defendant's objections. It appears to the court that the defendant essentially reargues the case it presented to the Magistrate and the court will not reiterate those arguments as they are more than amply set out in the report and recommendation of Magistrate Balog. After a *de novo* review of the record, and the memoranda of counsel, the court is satisfied that the well-reasoned report and recommendation of Magistrate Balog is in accordance with law. Defendant's objections to the report and recommendation of Magistrate Balog are overruled. The court adopts the report and recommendations of Magistrate Balog as its own; and, for the reasons set forth in his report which is attached hereto and incorporated herein by reference, the motion of the defendant for summary judgment is denied and the motions of the plaintiffs for summary judgment are granted.

## REPORT AND RECOMMENDATION

JAMES T. BALOG, United States Magistrate.

This is a consolidated action for a refund of federal income taxes. Plaintiff W. Stewart Roberts claimed a refund of $275,650.00; plaintiff Robert G. Peters sought a refund of $1,237,453.00, and plaintiff Reuben D. Peters claimed a refund of $1,647,686.00, each for the 1984 tax year.

The parties have filed cross motions for summary judgment on the refund issue. Defendant also seeks summary judgment on the grounds that plaintiffs Reuben and Robert Peters failed to pay tax on funds credited to their trading accounts and that Robert Peters improperly deducted a charitable donation. Jurisdiction is founded on 28 U.S.C. § 1346(a)(1).

The facts in this case are not in dispute. The primary controversy involves the application of pertinent provisions of the Internal Revenue Code and the taxation of regulated futures contracts. Plaintiffs filed

separate complaints on December 19, 1986 seeking refunds of income taxes paid for the 1984 tax year. Plaintiffs are each registered market makers in stock options on the Chicago Board of Options Exchange (CBOE), and qualify as option dealers under 26 U.S. § 1256(g)(8) [1] of the Internal Revenue Code. A market maker is a CBOE member who trades security options and security index options on the CBOE for his personal account. The relevant trades made in this case involved IBM stock options and IBM stock.

Plaintiffs incurred substantial tax obligations in 1984, which each plaintiff duly paid. W. Stewart Roberts paid $275,798.00; Robert G. Peters paid $1,237,454.00, and Reuben Peters paid $1,650,038.00. However, in 1985, each plaintiff incurred significant net losses in securities and options transactions. W. Stewart Roberts suffered a loss of $2,023,980.00; Robert G. Peters suffered a loss of $5,670,316.00, and Reuben Peters suffered a net loss of $7,026,770.00. Plaintiffs claim that pursuant to 26 U.S.C. § 1212(c), these 1985 losses may be "carried back" to offset gains from similar activity in 1984, thereby reducing their respective 1984 taxable incomes. On February 7, 1986, each plaintiff filed a claim for a refund on Form 1040-X and an amended tax return reflecting the 1985 net losses which they carried back. Plaintiffs allege that these carrybacks reduced their 1984 tax obligations to $275,650.00 for W. Stewart Roberts; $1,237,453.00 for Robert G. Peters, and $1,647,686.00 for Reuben D. Peters. The Internal Revenue Service has agreed that the plaintiffs are entitled to a partial refund of $39,457.00 for W. Stewart Roberts; $1,055,176.00 for Robert G. Peters, and $1,185,058.00 for Reuben D. Peters. Accordingly, this dispute is limited to the balance of plaintiffs' refund claims, namely $236,193.00, $182,277.00 and $462,628.00 respectively. *See Memorandum in Support of Defendant's Motion for Summary Judgment,* p. 1.

The losses carried back which are specifically in dispute are the section 1256 contracts components of plaintiffs' mixed straddle accounts. The parties agree that the filing procedures for carrying back these losses were properly followed. Their differences relate solely to whether the section 1256 contracts losses, which are part of a mixed straddle account, could be carried back at all under the relevant statutes.

I

*The Carryback Issue—W. Stewart Roberts and Reuben D. Peters*

■ Defendant seeks summary judgment in the case of W. Stewart Roberts and Reuben D. Peters, contending that the carryback rules of section 1212(c) are inapplicable because of their mixed straddle account election made pursuant to section 1092. The relevant statutes in this case are sections 1212(c), 1256, and 1092 of the Internal Revenue Code. These sections were enacted pursuant to the Economic Recovery Tax Act of 1981, and deal with the taxation of commodities.

The dispute here concerns the application of these provisions, and since no court has apparently construed them together, presents a case of first impression.

*Statutory Background*

Prior to the Economic Recovery Tax Act of 1981 ("ERTA") there was no special provision of the Internal Revenue Code which governed the taxation of futures contracts. ERTA dramatically changed the treatment of futures contracts by enacting specific statutory provisions relating to futures contracts, namely, sections 1092 and 1256. The Tax Reform Act of 1984 also changed the tax treatment of futures contracts enacted by ERTA, but did not specifically modify its substantive provisions. Mertens, *Law of Federal Income Taxation,* Vol. 4, § 21A.01, p. 3 (1986).

*Section 1256*

A section 1256 contract means any:

1. regulated futures contract

---

**1.** 26 U.S.C. § 1256(g)(8) provides:
(A) *In general.* The term "options dealer" means any person registered with an appropriate national securities exchange as a market maker or specialist in listed options.

2. foreign currency contract
3. non-equity option and,
4. dealer equity option.

26 U.S.C. section 1256(b)(1–4).

Section 1256 requires certain regularly traded futures contracts to be "marked to the market." The mark to market system was intended to limit the use of tax shelter schemes involving futures contracts. Russo, *Regulation of Commodities and Futures*, § 15.17, pp. 15–37 (1983). Marking to market means that each section 1256 contract (as described above,) which is held by the taxpayer at the close of the taxable year shall be treated as sold for its fair market value on the last business day of the taxable year (and any gain or loss shall be taken into account for the taxable year). Section 1256(a)(1). Gains or losses with respect to section 1256 contracts are given "60/40" treatment. This means that gain or loss recognized on section 1256 contracts is treated as 60 percent long-term gain or loss, and 40 percent short-term capital gain or loss. § 1256(a)(3). Section 1256 also provides that the taxpayer may elect to have this section not apply to all section 1256 contracts which are part of a mixed straddle. § 1256(d)(1).

### Section 1212(c) "Carryback Rules"

When enacting section 1256 in ERTA of 1981, Congress provided specified relief provisions relating to regulated futures contracts. These provisions are explained in the Legislative History of ERTA P.L. 97–34 concerning Section 504 of the bill paragraph (d), Carryback of Loss from Regulated Futures Contracts To Offset Prior Gains From Such Contracts:

#### Reason for Change

"Investors in commodity futures contracts bear substantial risks and sometimes incur very significant losses because of the volatility of many futures markets. *The Congress recognized the significance of these risks, and the unique nature of futures contracts which are marked-to market daily for both trading and tax purposes,* even though an investor may continue to hold the same position. The Congress believed that the possible economic distor-

tions in income tax liability which might result from these factors might be adequately mitigated by capital loss carryforwards or the income averaging rules and should be alleviated; therefore, the Congress provided a three-year carryback for losses on futures contracts taxed under the mark-to market rules." *See* "General Explanation of the Economic Recovery Act of 1981" (H.R. 4242, 97th Congress, Pub.L. 97–34, *Joint Committee on Taxation,* p. 305).

Section 1212(c) permits taxpayers with losses from section 1256 contracts to carry those losses back to offset gains from section 1256 contracts that were taxed in prior years. This provision acts as an averaging mechanism to alleviate the harshness of the mark to market system in section 1256. If a taxpayer elects to apply the statute, the amount of the 1256 contracts loss shall be carried back to each of the three preceding taxable years. If the carryback is allowed, 40 percent of the section 1256 contracts loss is treated as short term capital loss from section 1256 contracts, and 60 percent of the section 1256 loss is treated as long term capital loss from section 1256 contracts 26 U.S.C. § 1212(c)(1)(B)(i), (ii). The amount of net section 1256 contracts loss allowed as a carryback is not to exceed the net section contract gain for the year. § 1212(c)(3). The statute does not specifically provide for any special treatment for section 1256 contracts contained in a mixed straddle. Rather, section 1212(c) defines section 1256 contracts as any section 1256 contract (as defined in section 1256(b)) to which section 1256 applies. 26 U.S.C. § 1212(c)(1). Section 1212(c)(1) is an elective provision in the discretion of the taxpayer. To make the election, the taxpayer completes Form 6781 "Gains and Losses from § 1256 Contracts and Straddles" and checks the appropriate box.

### Section 1092 Straddles

The term straddles is defined in section 1092(c)(1) of the Tax Code as "offsetting positions with respect to personal property." A position is defined as an interest (including a futures or forward contract or option) in personal property. § 1092(d)(2).

An offsetting position is a position that substantially reduces the risk of a loss the taxpayer has in the other position. § 1092(c)(2)(A).

Section 1092 was enacted to limit the taxpayer's recognition of loss in the case of straddles. It was further intended to prevent the deferral of income and the conversion of ordinary income and short-term capital gain on straddle transactions. That section provides that any loss with respect to one or more positions shall be taken into account for any taxable year only to the extent that the amount of such loss exceeds the unrecognized gain (if any) with respect to one or more positions which were offsetting with respect to one or more positions from which the loss arose. § 1092(a)(1)(A). The term "unrecognized gain" means the amount of gain which would be taken into account with respect to such position if such position were sold on the last business day of such taxable year at its fair market value, and in the case of any position with respect to which as of the close of the taxable year, gain has been realized but not recognized, the amount of gain so realized. § 1092(a)(3)(A). The statute further provides that in the case of a straddle where at least one (but not all) of the positions of which are section 1256 contracts, the provisions of this section shall apply to any section 1256 contract and any other position making up such straddle. § 1092(d)(5)(A).

### Mixed Straddles

A taxpayer may hold a mixed straddle consisting of section 1256 contracts and non-section 1256 contracts. Absent a special rule, the section 1256 component is subject to the mark to market rule while the non-section 1256 component is not. Plaintiffs held mixed straddles consisting of IBM dealer equity options (section 1256 contracts) and IBM stock (non-section 1256 contracts). Where a market maker has trading activity in section 1256 contracts and non-section 1256 contracts, the tax code allows the trader to make a mixed straddle account election.

Section 1092(b)(2) grants authority to the Secretary of the Treasury to promulgate rules for the treatment of a gain or loss from mixed straddles. Temporary Treasury Regulation § 1.1092(b)–4T allows the taxpayer to designate as a class of activities the types of positions that a reasonable person would ordinarily expect to be offsetting positions.

Temporary Treasury Regulation § 1.1092(6)(c) provides that as of the close of each business day of the taxable year gain or loss shall be determined for each position in a mixed straddle account that is disposed of during the day. Positions that have not been disposed of as of the close of the day shall be treated as if sold for their fair market value at the close of each business day. Gains and losses for each business day from non-section 1256 positions in each mixed straddle account shall be netted to determine "net non-section 1256 position gain or loss" for the account, and gains and losses for each business day from section 1256 contracts in each mixed straddle account shall be netted to determine "net section 1256 contract gain or loss" for the account. Net non-section 1256 position gain or loss from the account is then offset against net section 1256 contract gain or loss from the same mixed straddle account to determine the "daily account net gain or loss from the account." If daily account net gain or loss is attributable to the net *non-section 1256 position gain or loss*, daily account net gain or loss for such account shall be treated as short term capital gain or loss. If daily account net gain or loss is attributable to the *net 1256 contract gain or loss*, daily account net gain or loss for such account shall be treated as 60 percent long term capital gain or loss and 40 per cent short term capital gain or loss.

Treasury Regulation § 1.1092(b)–4T(c)(4) imposes a limit of 50% on the total annual net gain that can be treated as long-term capital gain and a limit of 40% on the total annual net loss that can be treated as short term capital loss.

### Mechanics of Sections 1256 and 1092

Under the CBOE rules, market makers are required to make continuous two-sided markets. To minimize exposure to unac-

ceptable risk, market makers must keep themselves apprised of the positions they hold so as not to become overly short or overly long. Market makers seek to balance their portfolios by offsetting long and short positions to maintain net positions that are consistent with their view of the market and their tolerance for risk. Pl. Amicus Brief, p. 1. Market makers reduce exposure to risk by balancing one position with an opposite position. As previously noted transactions involving balanced or "offsetting" positions are referred to as straddles, and are subject to taxation under sections 1092 and 1256.

Sections 1256 and 1092 provide several elections for determining the tax treatment of mixed straddles. A taxpayer may elect not to treat the section 1256 contract as a non-section 1256 contract, making the mixed straddle subject to the rules governing non-section 1256 straddles. § 1256(d)(1). Second, one may elect a "straddle by straddle" identification, where the net gain or loss is treated as 60/40 gain or loss if it is attributable to the section 1256 contract. § 1092(b)(2)(A); Temporary Treasury Regulation § 1.1092(b)–3T. Third, the taxpayer may make a "mixed straddle account" election. All positions are marked to market daily and gains or losses are netted. If the net gain or loss is attributable to the section 1256 leg of the straddle, it is given 60/40 treatment. § 1092(b)(2)(A); Temporary Treasury Regulation § 1.1092(b)–4T(c).

A taxpayer who elects to use the mixed straddle account places all offsetting positions in that class in the account. Each day a position is disposed of, the gain or loss on that position is netted with gain or loss on all other positions in that account, whether or not the gain or loss has been recognized. Temporary Treasury Regulation § 1.1092(b)–4T(c)(1). Thus there is a *daily* marking to market. The 60/40 rule of section 1256 is applied *only after* offsetting gains or losses on the straddle positions, and only to the section 1256 leg of the straddle. Thus, if the net gain or loss for the day is attributable to section 1256 contracts, it is treated as section 1256 contract gain (i.e. 60 percent long term and 40

percent short term). If the net capital gain or loss is attributable to non-section 1256 contracts, it is treated as non-section 1256 gain or loss (i.e., short term capital gain or loss). Temporary Treasury Regulation § 1.1092(b)–4T(c)(1). Thus, whether or not the 60/40 rule of section 1256 applies to the straddle depends upon whether the daily net gain or loss is due to the section 1256 contract leg of the straddle.

For purposes of section 1212(c), the term "section 1256 contract" means any section 1256 contract (as defined in section 1256(b)) to which section 1256 applies. There are two exceptions. First, section 1256 does not apply to section 1256 contracts that are part of a hedging transaction. Section 1256(e). Second, as previously noted, section 1256 may not apply to section 1256 positions which are part of a mixed straddle but *only* if the taxpayer makes this election. § 1256(d)(1).

As previously noted, the controversy in the instant case does not involve the facts, but rather the application of the foregoing statutes. Defendant first argues that plaintiffs W. Stewart Roberts and Reuben D. Peters are not entitled to a full tax refund because of the mixed straddle account election pursuant to section 1092 which they made on their 1985 tax forms. Defendants argue that once a section 1092 election is made, the loss no longer has the characteristics of a loss under section 1256. Therefore defendants contend, because the loss is not governed by section 1256, a carryback under section 1212(c) is not allowed. Defendants maintain that the mixed straddle account regulations govern entirely the taxation of positions in a mixed straddle account.

Defendant maintains that after applying the daily marking to market and netting rules to the non-section 1256 contracts and the Temporary Treasury Regulations cited infra, the resulting gain or loss of a mixed straddle account bears little if any similarity to a pure section 1256 gain or loss. Defendant further states that any loss attributable to the section 1256 contract leg of a mixed straddle is not governed by section 1256 but is governed by section

1092. Defendant essentially argues that although the straddle contains section 1256 and non-section 1256 components, even the section 1256 loss cannot be carried back because in making a mixed straddle accounts election, the section 1256 leg is now subject to section 1092.

Defendant argues that to apply the loss carryback rules of section 1212(c) to the section 1256 contract leg of mixed straddle would contravene legislative intent. Defendant contends that section 1212(c) carryback rule was designed to minimize the tax risks inherent in futures contracts which are marked to market. However, a taxpayer who elects a straddle is already taking an offsetting position in personal property to reduce the economic risk of loss. The nature of a straddle reduces if not eliminates those risks of losses relied upon by Congress as the rationale for enacting section 1212(c). A taxpayer's participation in a mixed straddle accomplishes the same purpose of reducing the economic risk of loss associated with futures contracts. See *Memorandum in Support of United States Motion for Summary Judgment, pp. 22–23.*

Plaintiff Roberts has presented the affidavit of William J. Kevil and Amicus Curia Memorandum filed on behalf of the Chicago Board of Options Exchange, Inc. to argue that the section 1256 components of his mixed straddle account may be carried back pursuant to section 1212(c).

William J. Kevil prepared the tax returns and amended tax returns for both Roberts and Reuben Peters. Both Roberts and Reuben Peters traded four types of instruments in 1984 and 1985: futures contracts on Standard and Poors 500 Stock Index, Non Equity Option Contracts on Standard and Poors 100 Stock Index ("OEX Contracts") IBM Dealer Equity Options ("IBM Options"), and IBM stock. Kevil Affidavit, p. 2.

Standard and Poors contracts are "regulated futures contracts" as defined in IRC § 1256(g)(1), and qualify as a section 1256 contract under section 1256(b)(1). As such, these are given "60/40 treatment," i.e., the gain or loss from these contracts is treated as 40 percent short-term capital gain or loss and 60 percent long-term capital gain or loss. These contracts are also subject to the "mark to market rule," and are treated as sold for their fair market value on the last business day of the taxable year. OEX contracts are "non-equity" options as defined in IRC § 1256(g)(3) and are also subject to the foregoing tax treatment. Kevil Affidavit, p. 3.

IBM options are "dealer equity options" as defined in IRC § 1256(g)(4). IBM stock, however, is a capital asset and is generally given long term or short term capital gain or loss treatment predicated upon the holding period of the stock. Kevil Affidavit, pp. 3–4.

In 1985, Roberts and Reuben Peters had "straddles" pursuant to IRC section 1092(a) consisting of the IBM dealer equity options and contemporaneously held "offsetting positions" in IBM stock. These straddles were classified as "mixed straddles" as defined in Temporary Treasury Regulation § 1.1092(b)(5T), Definition (e). Kevil Affidavit, p. 4. The gains and losses in the mixed straddles were accounted for pursuant to Temporary Treasury Regulation § 1.1092(b)–4T(c)(1) and (2). Roberts' and R.D. Peters timely elected to make a mixed straddle account election on their amended 1984 returns for 1985 pursuant to Temporary Treasury Regulation § 1.1092(b)–4T(f)3.

In preparing plaintiffs' tax forms, Kevil used daily and monthly summaries of Roberts' and Peters' trading account activity called "Trading Sheets," which were prepared by Petco Options, Inc., plaintiffs' clearing firm. Kevil entered all of Roberts' and Peters' 1985 trades into a computer for processing by a 1092 Netting Program which Kevil developed. This program was specifically designed to comply with the accounting requirements in Temporary Treasury Regulation § 1092(b)–4T(c)(1). Defendant does not allege that the mixed straddle account gains and losses were improperly calculated. Rather, defendant contends that the losses from the section 1256 component of the

straddle could not be carried back under section 1212(c).

Roberts reported IBM mixed straddle account losses from IBM dealer equity options (section 1256 contracts) on Form 6781, in the amount of $4,387,038.00. He reported gains from IBM stock (*non* -section 1256 contracts) on Schedule D in the amount of $2,456,958.00. Roberts' total IBM mixed straddle account loss for 1985 was $1,900,-090.00. Roberts also reflected on Form 6781 OEX options gains (section 1256 contracts) in the amount of $1,802,360.00 and Standard and Poors losses (also section 1256 contracts) of $1,926,260.00.

Roberts elected to carryback the 1985 section 1256 contract losses to the prior tax year by checking Box D on the 1985 Form 6781. Kevil Affidavit, pp. 7–8; Pl.Ex. I. Form 6781 instructs "to carryback your loss, file an amended Form 6781 for the applicable year, together with a form 1040–X or amended return." See Pl.Ex.K. OEX contracts were netted with unrelated capital gains and losses (IBM Stock) which resulted in a net capital loss. Kevil Affidavit, p. 8. The net section 1256 contract loss available for carryback as defined in section 1212(c) is the lesser of (i) the net capital loss for the taxable year for section 1256 contracts or (ii) the sum of net short term capital loss and net long term capital loss for the taxable year.

The instructions on Form 6781 issued by the IRS for 1985 state:

"mixed straddle account election … if the net gain or loss is attributable to a section 1256 position, enter the gain or loss in Part I of Form 6781 and identify the election." … See section 1212(c) for definition of net section 1256 loss …
Kevil Affidavit, p. 8; p. 1. Ex.K.

The instructions clearly indicate that where the net annual results of a mixed straddle account are attributable to section 1256 contract losses, the section 1256 contract losses are to be reported on Form 6781. Part I of Form 6781 is used to compute

section 1256 contract loss carrybacks and is governed by IRC section 1212(c).

Subparagraph 4 of IRC Section 1212(c) states:

(4) net section 1256 contract loss—For purposes of paragraph (1), the term "net section

1256 contracts loss" means the lesser of

(A) the net capital loss for the taxable year determined by taking into account only gains and losses from section 1256 contracts, or

(B) the sum of the amounts which but for paragraph (6)(A), would be treated as capital losses in the succeeding taxable year under subparagraphs (A) and (B) of subsection (b)(1).

Roberts reflected on part I of Form 6781 the net capital loss taking into account gains and losses in Roberts' IBM dealer equity options and other section 1256 contracts.

In 1985, Roberts had net section 1256 contract losses of $4,510,938.00, and net short term capital losses and net long term capital losses of $2,023,980.00.[2] Section 1212(c) only allows section 1256 contract losses to be carried back in an amount necessary to offset prior years section 1256 contract gains. Roberts' 1984 section 1256 contract gains totalled $949,075.00. Therefore, only that amount of 1985 section 1256 contract losses was carried back. Of the $1,074,095.00 not carried back ($2,023,-980.00–$949,075.00), $3,000.00 was deducted on the 1985 return and the remainder was carried forward to 1986. Kevil Affidavit pp. 10–11.

Reuben Peters' 1985 section 1256 contract losses totalled $5,493,165.00. This was the maximum Peters could carryback and then only to offset gains earned in the prior year. Reuben Peters had 1984 section 1256 contract gains of $5,168,282.00 Therefore, only $5,168,282.00 of the

**2.** Roberts' total 1985 capital losses were comprised of:

| | |
|---|---|
| Standard & Poors Commodity future losses | $1,926,260.00 |
| OEX Contract Gains | $1,802,360.00 |
| IBM Mixed Straddles | $1,900,080.00 |

$5,493,165.00 could be carried back, leaving $1,647,686.00.

Subsequent to initiation of this lawsuit, defendant audited Roberts' and Peters' 1984 Returns, 1985 Returns and amended 1984 Returns. The IRS Agent's Report indicated that Roberts' refund of $275,-650.00 was being allowed in part to the extent of $39,457.00. Defendant allowed Roberts to carryback $123,900.00 in section 1256 contract losses; the losses suffered in IBM dealer equity options were not allowed. The IRS Agent's report states that the mixed straddle account according to section 1092 changes the individual legs of the straddle to short-term or long-term capital gain or loss and cannot be carried back. The report stated these losses from the mixed straddle account can only be carried forward, as any other capital loss. Roberts' Exhibit N; Kevil Affidavit, p. 12.

The IRS Agent reported that Reuben Peters was entitled to a refund of $3,863.00 in income taxes paid in 1983 and $1,185,-058.00 in income taxes paid in 1984 for a total of $1,188,921.00. As in Roberts' case, the agent eliminated Reuben Peters' IBM dealer equity option losses from Form 6781 and placed the loss on Schedule D. The elimination reduced Peters' total 1985 section 1256 contract losses of $5,468,681.00 to $4,137,809.00. This prevented Peters from carrying back sufficient losses to offset the $5,168,282.00 of 1984 section 1256 contract gains.

After analyzing the statutes, regulations, and supporting affidavits the court finds that losses from section 1256 contracts which are part of a mixed straddle may be carried back under section 1212(c).

Nothing in the statutory language indicates that such losses may *not* be carried back. The purpose of the Tax Reform Act of 1984 was to prevent abuses of mixed straddles. If carrybacks were perceived as an abuse, Congress would have enacted legislation to specifically preclude carrybacks in mixed straddles.

If net loss under § 1092 is attributable to section 1256 contracts loss, the net loss must be reported as 60 percent long-term loss and 40 percent short-term loss. There-fore, the mixed straddle rules under 1092 apply the 60/40 rule found in section 1256. Section 1092 mirrors § 1256 where the net loss in a mixed straddle is the result of a section 1256 contracts loss. Absent statutory language to the contrary, the court sees no reason why the section 1256 losses should not be subject to the 1212(c) carryback rules since even § 1092 treats a mixed straddle as a section 1256 contract. Under 1092, the § 1256 contracts have not lost their "character" as defendant suggests since they are given the same 60/40 treatment they would have received had they not been part of the straddle.

Since the tax rules of section 1256 apply to these losses, section 1212(c) would also apply since 1212(c) explicitly applies to *all* 1256 contracts. Section 1212(c) states that "if a taxpayer has a net section 1256 contracts loss for the taxable year, and elects to have this section apply," the section 1256 contracts loss may be carried back. A plain reading of the statute shows that it does *not limit* carrybacks solely to "pure" section 1256 contract losses as defendant argues. The statute is not even ambiguous on this point; rather, it is silent as to the application of section 1212(c) to section 1256 contracts losses in mixed straddles. In light of the perceived abuses Congress sought to remedy under ERTA, Congress could easily have limited section 1212(c) solely to pure section 1256 contracts losses or eliminated its application from the section 1256 portion of mixed straddles altogether. Congress did not choose to do so, and this court will not take it upon itself to do so either.

Plaintiffs argue that the instructions on Form 6781 do not restrict carrying back losses to only "pure" section 1256 contracts. These instructions are not binding on the court as IRS publications are merely guides published by the IRS to aid the taxpayer. *Greene v. Commissioner,* Docket No. 2684–87 T.C. Memo (July 21, 1988). Only the statutes, regulations, and judicial decisions are controlling. *Smith v. Commissioner,* Docket No. 7289–82, T.C. Memo (May 21, 1984). However, although the instructions to Form 6781 are not binding,

they parallel the requirements of the tax code. Temporary Treasury Regulation § 1.1092(b)–4T(c)(i) provides that net gain or loss from the mixed straddle accounts that is attributable to section 1256 contracts, is treated as a 60/40 gain or loss. The instructions to Form 6781 also provide that if the net gain or loss from the mixed straddle is attributable to section 1256 positions, the taxpayer should "enter the gain or loss in Part I of Form 6781 and identify the election." The amount to be carried back under section 1212(c) is also computed in Part I of Form 6781.

Defendant argues that the mixed straddle account regulations govern the taxation of positions in a mixed straddle account, and not section 1256. Section 1092(b)(2) discusses offsetting gains and losses which are part of a mixed straddle. That section provides:

"ii) such offsetting will occur before application of section 1256, and section 1256(a)(3) will apply only to net gain or loss attributable to section 1256 contracts ..."

Section 1256(a)(3) provides that gain or loss section 1256 contracts shall be treated as:

"(A) short term capital gain or loss, to the extent of 40 percent of such gain or loss, and

(B) long term gain or loss, to the extent of 60 percent of such gain or loss...."

Section 1212(c) only covers 1256 contracts "to which section 1256 applies." Section 1092, therefore, does not supplant the tax treatment afforded section 1256 contracts in section 1256. It merely provides that *after* offsetting, section 1256 applies to the net gain or loss attributed to section 1256 contracts.

Furthermore, defendant notes the danger of a taxpayer carrying back non-section 1256 position losses by "simply producing a section 1256 contract loss in a mixed straddle where no true economic loss occurred." Memorandum In Support of United States Motion for Summary Judgment, p. 24. But this danger is mitigated by the fact that section 1256 losses can only be carried back if the taxpayer incurred section 1256 *gains* in the prior year; and then only by the amount of gains earned and no more.

Defendant further argues that section 1256 and non-section 1256 contracts do not retain their full identity under the mixed straddle account election. Defendant argues that under daily rules the taxation of the positions in a mixed straddle account are determined by netting the section 1256 positions with the non-section 1256 positions. Defendant claims that after netting, the gain or loss is neither section 1256 nor non-section 1256, but short-term and long-term.

A reading of Temporary Treasury Regulation § 1.1092(b)–u(c)(1) negates this interpretation of mixed straddle account tax treatment. The regulation requires a daily account netting of gains and losses in the account. If the daily net gain or loss is attributed to a non-section 1256 position, it is considered short-term. If it is attributed to a section 1256 position, it is considered 60 percent long-term and 40 percent short-term. In other words, if the daily net gain or loss is attributed to section 1256 positions, it is treated like all other "pure" section 1256 contracts, under the 60/40 rule.

Since the regulation itself treats the section 1256 contract loss as though it were a "pure" section 1256 contract, the court sees no reason why that leg of the mixed straddle account cannot be carried back under section 1212(c), a provision specifically designed for section 1256 contract losses.

It is recommended that in light of the foregoing analysis, defendants' motion for summary judgment on the carryback issue be denied and the plaintiffs' W. Stewart Roberts and Reuben Peters motions for summary judgment be granted.

## II

*Robert G. Peters*

█ Defendant does not dispute the carrybacks made by Robert Peters because Peters did not report any mixed straddle account net losses in 1985. *See, Memorandum in Support of Defendants' Motion for Summary Judgment*, p. 6 ¶ 9. How-

ever, Robert Peters claims that the IRS improperly removed $1,796,944.00 of section 1256 contract gains from the computation of total section 1256 contract losses available to be carried back under section 1212(c).

Robert Peters also traded IBM dealer equity options and IBM stock in 1985, and accounted for gains and losses in trading under the mixed account election rules under section 1092. The gains earned in Peters' trading of IBM dealer equity options were reported on Form 6781 of his 1985 return. *Peters Memorandum in Support of Motion for Summary Judgment*, p. 2. When included with all other losses, Peters had net section 1256 contract losses of $4,080,258.00. Peters elected to carryback a total loss of $4,013,833.00 and reflected the remaining losses of $1,653,483.00 as a carry forward on Schedule D of the 1985 return.

The IRS contends that because Peters made the mixed straddle account election, the IBM dealer equity option gains should not have been reported on Form 6781, since that form is only for section 1256 contracts. Rather, they should have been reflected on Schedule D. As a result of an audit, the IRS therefore removed the IBM dealer equity options gains from Form 6781 to Schedule D. This raised Peters' section 1256 contract losses from $4,080,258.00 to $5,877,202.00. The gains which Peters carried forward were thereby reduced from $1,653,483.00 to $1,179,297.00. *Id.* at 3–4. Peters argues that this change increases his taxes for 1984 and that he is unable to carry forward a total of $474,186.00 in 1985 section 1256 contract losses to offset gains in future years. *Id.* at 5–6.

Defendants charge that the court lacks jurisdiction on this issue pursuant to 28 U.S.C. 1346(a). That section provides:

"The district court shall have original jurisdiction, concurrent with the court of claims, of: (1) any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."

26 U.S.C. § 7422 states that the court has jurisdiction when a claim for refund or credit has been duly filed with the Secretary of his delegate.

Defendant states that the issue does not fall within the court's tax refund jurisdiction because the refund will have no tax effect on Peters' taxes in 1984 and 1985. The court finds that this issue is within the court's jurisdiction as Peters' complaint shows that he filed a claim for a refund in the amount of $1,237,453.00. Defendant has admitted that the disputed amount for 1984 is $182,277.00. Furthermore defendants act of moving Peters dealer equity options gains from Form 6781 to Schedule D *increased* Peters' 1984 taxes. Therefore, defendants' argument that Peters' 1984 taxes are not affected is mistaken.

The court finds that Robert G. Peters' 1985 section 1256 contract losses were properly reflected on Form 6781, thereby allowing Robert G. Peters to carry forward his remaining losses.

### III

*The Credit Entry Issue—Robert G. Peters and Reuben D. Peters*

■ Defendant and plaintiffs Robert and Reuben Peters have also filed cross-motions for summary judgment regarding the entry of credits in plaintiffs' options accounts. Defendant argues that plaintiffs Robert and Reuben Peters should have paid income taxes on certain credits entered on their trading accounts during 1984, but which were subsequently deleted in 1985. Robert Peters was paid $663,000.00 in credit entries at Petco Options, Inc. ("Petco") and Reuben Peters credit entries totalled $236,544.00. Plaintiffs argue that no taxes are owed because these credits were erroneously entered by Petco without plaintiff's knowledge, and are therefore not income. *See* Reuben Peters' Memorandum In Support of Motion for Summary Judgment, pp. 9–11; Robert Pe-

ters' Memorandum In Support of Motion for Summary Judgment, pp. 10–11.

Robert and Reuben Peters have come forward with their own affidavits and the affidavit of Timothy Vincent, their supervisor at Petco. Robert Peters and Reuben Peters were employed by Petco Options Co. ("Petco") as paid brokers.

CBOE clearing members such as Petco lend money to their customers to maintain or initiate CBOE transactions. Petco executes CBOE transactions for its market maker customers at the request of the customers in return for a fee. Those executing such trades include salaried employees ("paid brokers") of Petco who were nominees of the Chicago Board of Trade "exercised" memberships owned by other parties and pledged to Petco. An "exercised" membership is where the owner exercises the right to become a CBOE member. Commissions are paid by customers to Petco for trades executed by the paid brokers. Petco keeps the commissions. As paid brokers, Reuben and Robert Peters did not receive commissions. However, independent brokers received commissions since they were responsible for errors on the trades, paid for their own memberships, but received no salary.

Petco was run by general partners, Ralph N. Peters and Ingrid Peters. Vincent Affidavit, ¶ 3. Petco was a clearing member of the CBOE Chicago Board Options Exchange ("CBOE"), and Midwest Stock Exchange. As such, it was authorized to clear members of the CBOE and Midwest Stock Exchange, but not CBOE public business. Vincent Affidavit, ¶ 1–3. Petco had a policy to offer certain CBOE members interst on their free funds if they would clear them at Petco. Vincent Affidavit, ¶ 6. Neither Robert nor Reuben Peters were made such an offer because Petco did not seek them out for their clearing business. *Id.* at ¶ 13. Prior to instituting this policy, Petco obtained the benefit of the interest earned on such funds which Petco invested. Vincent Affidavit ¶ 6.

At no time did Reuben or Robert Peters have any ownership interest in Petco. As paid brokers, they filled orders for Petco's customers on the floor of the CBOE. Reuben and Robert Peters Affidavits, ¶ 2. They were allowed to maintain a trading account at Petco in which they could trade CBOE options and underlying securities for their own accounts. Vincent Affidavit, ¶ 7. Both were paid a salary and were allowed two weeks paid vacation, and participation in Petco's group insurance. Both were supervised by Timothy Vincent, Chief Operating Officer of Petco. Neither Reuben nor Robert Peters were aware of any arrangements to pay interest on free funds in 1984. Robert Peters knew that credits were being made to his accounts, but he thought they were either rebates or keypunch error changes. He did not know the source of or reason for the credit. R.G. Peters Affidavit, ¶ 1–6; Vincent Affidavit, ¶ 15. Neither Robert nor Reuben Peters reported the credit entries on their 1984 federal income tax returns, nor did they deduct anything from their 1985 return because they had been eliminated. R.D. Peters' Affidavit, ¶ 6.

As a CBOE clearing member, Petco processes CBOE transactions of its customers and submits them to CBOE for matching with opposing trades. The CBOE then submits the matched trades to the Options Clearing Corp. ("OCC") which intervenes between the parties and issues long option contracts to the buyer and short option contracts to the seller. Both buyer and seller look to OCC for satisfaction of their CBOE option contracts obligations. This process ensures the financial integrity of the CBOE to the parties. Trades were recorded on trading sheets. Trading sheets contained data such as "realized and unrealized losses, daily price changes of options and stock, open positions, date of trades, commissions, SEC fees, haircut changes, interest charges and receipts, dividends received, option obligations, and net liquidating ("Net Liq") balances." Vincent Affidavit, ¶ 5. Net Liq balances represent the total value of the account upon liquidation of all positions. *Id.*

In early December 1984, Vincent learned that actual Petco revenues were well below projected revenues. Vincent then instruct-

ed Petco's accounting staff to make a monthly breakdown of the Petco net revenue for the period to determine the cause of the disparity which he received in February, 1985. *Id.* at ¶ 12. At that time, Vincent learned that Petco mistakenly booked credit entries in the accounts of Robert and Reuben Peters during August–December 1984. Vincent determined that the credit entries represented interest on free funds in Robert and Reuben Peters' accounts since the payments approximated the rate paid on agreement to Petco market makers on their free funds. *Id.* Vincent told Robert and Reuben Peters that they were not entitled to the credit (to which they agreed) and that the credit entries would be reversed out of their accounts. These entries were not reversed until March 1985. Petco initially took a deduction during 1984 but the credit entries made by this deduction were reversed as of December 31, 1984. Vincent Affidavit, ¶ 18. Although Vincent attempted to discover which clerk had authorized the interest agreements, he was not able to do so since the entries were prepared by a third party processor who did not keep hard copy of the data beyond a few days. Vincent instructed Petco's accounting staff to reverse the credit entries to both accounts as of December 31, 1984. Vincent Affidavit, ¶ 6.

Peters stated in his affidavit that he did not read his trading sheets in 1984, other than some general information on the first page of his market maker report, the out-trade sheet, and the confirmations. R.D. Peters Affidavit, ¶ 5. He stated that his trading sheets were "very confusing" due to the option trading done in 1984 because they accounted for trades done on an accounting basis and did not calculate the entire portfolio. *Id.* He would only check the net liquidation figure on the sheets on a daily basis to obtain a general idea of what was in his account. *Id.* Robert Peters also used the net liquidation figure to keep track of his account. He also stated that his trading sheets were confusing due to the types of trading he did in 1984 especially with respect to the short selling of securities. The trading sheet showed the short option as a loss on the debit side of

the mark to market training sheets but not the gain or loss in positions. R.G. Peters Affidavit, ¶ 5. The record does not show whether plaintiffs, in checking the Net Liq totals observed any significant changes in their accounts that would put them on notice of the mistaken credit entries.

Plaintiffs argue that the bookkeeping entries were not income because they are not funds earned as a result of any agreement between Petco and plaintiffs or by any services performed by plaintiffs and therefore plaintiffs had no right to the funds. Having no right to the funds, Plaintiff's argue, the funds cannot be income.

26 U.S.C. section 61 defines gross income as "all income from whatever source derived including ... (1) Compensation for services, including fees, commissions, fringe benefits and similar items; and (4) interest." "Taxable Income" is the accrual of some gain, profit, or benefit to the taxpayer. *Buder v. United States*, 354 F.2d 941, 944 (8th Cir.1966) *citing Commissioner v. Wilcox*, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752 (1946).

Defendant relies upon the claim of right doctrine to support its argument. The doctrine contemplates that if a taxpayer receives earnings under a claim of right and without restriction as to its dispositon, he has received income which he is required to report on his tax return, even though it may still be claimed that he is not entitled to retain the money and even though he may still be adjudged liable to restore its equivalent. *United States v. Lewis*, 340 U.S. 590, 591, 71 S.Ct. 522, 522–23, 95 L.Ed. 560 (1951); *North American Oil v. Burnet*, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932).

The taxpayer's assertion of his bona fide or equitable claim to monies upon receipt of monies paid, however, is of essential significance. The existence of a taxpayer's claim of right depends upon particular facts, including the circumstances under which the taxpayer receives money and the intention and understanding under which they were paid to him. 2 Mertens, *Law of Federal Income Taxation*, § 12.119 p. 479 (1985). Importantly, the claim of right doctrine

does not apply where the taxpayer does not take money under a bona fide claim of right or entitlement or subject to substantial restrictions upon their disposition. *Id.* However, there is a claim of right when funds are received and treated by the taxpayer as belonging to him. *Healy v. Commissioner*, 345 U.S. 278, 282, 73 S.Ct. 671, 674, 97 L.Ed. 1007 (1952) *Moore v. Thomas*, 131 F.2d 611, 613 (5th Cir.); Note, *Taxing Unsettled Income: The Claim of Right Test*, 58 Yale L.J. 955, 958 (1949).

Based on the evidence presented, the court finds that plaintiffs are not required to pay taxes on the funds erroneously credited to their accounts. Clearly, plaintiffs did not accept these funds under a bona fide claim of right. By their own affidavits, plaintiffs were not even aware that the funds were being credited. Common sense dictates that they could not exercise a claim of right to something of which had no knowledge. Because plaintiffs did not treat the funds as their own or belonging to them, the claim of right doctrine is inapplicable.

Defendant argues that regardless of whether plaintiffs were aware of these entries, they had possession and control over the use and disposition of their options account funds, and that they could have withdrawn the funds anytime after it was credited. Defendant maintains that Peters' opportunity to utilize the additional funds in their options accounts and their failure to renounce these funds before the end of 1984 causes them to be taxable for that year. Defendant's Motion for Summary Judgment, pp. 25–27.

The fact that plaintiffs *could* have used the money is irrelevant for tax purposes—what matters is what in fact occurred. There is no evidence that plaintiffs derived any benefit, profit or gain from the funds such that it could properly be considered "taxable income." To force Reuben and Robert Peters to pay taxes on monies which they did not know about, did not use or enjoy, or did not acknowledge or treat as their own would be inequitable.

IV

*Charitable Donation Issue—Robert G. Peters*

■ Defendant contends that a charitable donation made by Robert Peters in 1983 of $1,950.00 and which was carried over to 1984 and then deducted on Peters' 1984 tax return was not a charitable donation. Defendants' argument is based on the fact that on Peters check to "Women's Board— North Shore Country Day School" contains a notation "auction." The IRS disallowed the contribution on grounds that Peters purchased items at the auction. *R.G. Peters' Motion for Summary Judgment*, ¶ 23, p. 6. Peters maintains that the IRS never raised this issue in its audit of Peters' 1984 return and never inquired about the matter to Peters or the preparer of his tax return.

Peters has stated that he cannot recall purchasing any item from the North Shore Country Day School or its Women's Board at an auction in 1983 except lottery tickets. Nothing was won with the lottery tickets. R.G. Peters Affidavit, ¶ 8, p. 3. Defendant's only response is that the deduction was denied because Peters failed to meet his burden of proof in substantiating its legitimacy. Since defendant has not come forward with any countervailing affidavits or other evidence, the court should grant Robert G. Peters' motion for summary judgment on the grounds that there is no genuine issue of material fact.

For these reasons, it is recommended that the defendants' motion for summary judgment as to all issues be DENIED and that the plaintiff's motion for summary judgment as to all issues be GRANTED.